HONORABLE RICHARD A. JONES

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

DARLENE MENDOZA
GONZALES,

Plaintiff,

vs.

SAFECO INSURANCE
COMPANY OF AMERICA, a
foreign company,

Defendant.

Case No. 2:24-cv-01832-RAJ

**ORDER**

## I.    INTRODUCTION

This matter comes before the Court on Defendant Safeco Insurance Company of America's Motion for Summary Judgment (the "Safeco Motion," Dkt. # 33), and Plaintiff Darlene Mendoza Gonzales' Partial Motion for Summary Judgment (the "Gonzales Motion," Dkt. # 35).   The Court has reviewed the Safeco Motion and the Gonzales Motion (collectively, the "Motions"), the submissions in support of and in opposition to the Motions, the balance of the record, and the governing law.   Plaintiff requests oral argument on the Gonzales Motion, but the Court finds that oral argument is not necessary to resolve either of the Motions.

ORDER – 1

For the reasons set forth below, the Court **DENIES** each of the Safeco Motion and the Gonzales Motion in their entirety.

## II.    BACKGROUND[1]

In 2021, Plaintiff Darlene Mendoza Gonzales purchased her home (the "Property") in Tacoma, Washington. Dkt. ## 34-1, 34-2. Defendant Safeco Insurance Company of America ("Safeco") issued a homeowner's insurance policy, No. OH2219404 (the "Policy") on the Property beginning in 2021. Dkt. # 34-3. The Policy, which names Plaintiff as the insured, was renewed for subsequent annual policy periods, including, as relevant here, from May 5, 2023 through May 5, 2024. *Id.* During the 2023-2024 policy period, Plaintiff sustained and submitted claims for two successive water losses at the Property, one in September 2023 (the "First Loss") and one in January 2024 (the "Second Loss"). Dkt. ## 34-5, 34-6. Plaintiff's claim for the Second Loss, and Safeco's handling of that claim, forms the basis of this action. However, because the aftermath of the First Loss is relevant to the parties' claims in this action, the Court will provide a brief factual overview of both losses.

The First Loss occurred on September 3, 2023, when a hot water supply line burst and flooded the crawlspace at the Property. Dkt. ## 34-5; 34-8 at 9, 30–31. Safeco initially agreed to afford partial coverage for the claim and issued payment of $20,621.97 for dwelling repairs. Dkt. ## 34-16, 34-17. However, Plaintiff disputed the scope of the repair estimate and submitted independent estimates from two separate contractors. Dkt. # 34-19. Additionally, Plaintiff requested additional living expenses (ALE) coverage under the Policy. Dkt. # 34-8 at 25. Safeco reviewed and approved the contractor estimates provided by Plaintiff, and issued a supplemental check totaling $55,578.60.

---

[1] The following factual allegations are undisputed unless otherwise noted.

ORDER – 2

Dkt. ## 34-16, 34-20.  Safeco also approved a temporary housing assignment for Plaintiff pursuant to the Policy's ALE coverage.  Dkt. # 34-8 at 23–24.

On January 15, 2024, before repairs related to the First Loss had been completed, multiple pipes burst throughout the Property, including in the upstairs master bedroom and the garage, resulting in the Second Loss.   Dkt. # 34-27 at 24; Dkt. # 34-28.  Safeco received notice of the Second Loss the following day, and sent correspondence to Plaintiff acknowledging the incident.  Dkt. ## 34-6, 34-22, 34-23.  Shortly after the occurrence of the Second Loss, Plaintiff retained public adjusting firm Pacific Public Adjusters ("PPA") to assist with adjustment and negotiation of the Policy.  Dkt. # 34-26.  PPA sent Safeco a notice of its representation of Plaintiff on January 26, 2024, and Safeco acknowledged receipt of PPA's notice on February 20, 2024.  Dkt. ## 34-26, 34-29.  A PPA representative conducted an inspection of the Property on February 16, 2024, while mitigation work was underway.  Dkt. # 47 ¶ 2.  PPA prepared a specialized video and three-dimensional walkthrough, known as an "iGuide," which depicted the state of the Property at that point in time.  *Id.* ¶ 3.

Based on initial reports relating to the incident, Safeco sent PPA a Reservation of Rights letter on February 22, 2024, and commenced a preliminary investigation into whether heat had been maintained at the Property at the time of the Second Loss.  Dkt. # 34-30.  Safeco also relayed that, in addition to Senior Claims Resolution Specialist III Amber Cruz, field specialist John "J.C." Windmueller and personal property specialist Brianna Okoro had been assigned to assist with the claim.  Dkt. # 34-31.  On February 28, 2024, PPA provided Safeco with its repair estimate of $211,928.27.  Dkt. # 31-33.  The following day, PPA provided Safeco with copies of Plaintiff's utility bills for the previous 12 months.  Dkt. # 34-34.  After reviewing the bills, Safeco advised PPA that coverage had been afforded for the Second Loss.  *Id.*  Cruz noted that Windmueller would

ORDER – 3

inspect the Property on March 7, 2024, prepare an estimate, and work with PPA and the involved contractor to "reach an agreed cost of repairs." *Id.*

On March 7, 2024, Windmueller conducted his inspection of the Property. Dkt. # 46-3 at 15–16. Taylor Babb, the owner of PPA, was present at the inspection. *Id.*; Dkt. # 49. Windmueller's notes in Safeco's claim log for the Second Loss provide that Babb had "had very little information about the claims," including the location of the damage from the First Loss, and that Windmueller would "need to be discussing repairs with handling team for overlap potential of the two claims." Dkt. # 46-3 at 15. Babb, however, declares that Windmueller "maintained an abrasive and unprofessional demeanor" and engaged in "obstructive conduct" throughout the inspection. Dkt. # 49 ¶¶ 5–6. Windmueller purportedly "refused to acknowledge or inspect specific areas of water damage [Babb] pointed out," leading Babb to "conduct[] a comprehensive walkthrough to document the evidence of damages [Windmueller] ignored." *Id.* ¶¶ 6–7. Following the inspection, Windmueller recommended setting a dwelling reserve of $300,00. Dkt. # 46-3 at 16. Subsequently, Windmueller requested "an estimate, photos, and scarn [*sic*] for the initial claim damages from 9/3/2023," corresponding to the First Loss, to assure that Safeco was "accounting for overlap between the two claims." Dkt. # 34-36 at 5. PPA responded: "We do not have an estimate for the original claim, please let us know how you would like to identify and address the overlap areas." PPA subsequently clarified on March 19, 2024 that they were "not involved" prior to the Second Loss and therefore did "not have a walkthrough of the previous loss." *Id.* at 4. Windmueller's claim log notes from the same day provide :

> Received the same iGuide scan/walkthru as previously rcvd. Requested an iGuide for the prior water claim from 9/3/2023. I cannot tell if the scan was done prior to the water mitigation for this claim, or was done as mitigation had begun on this claim. I am trying to differentiate the damage/ mitigation for this claim from the

ORDER – 4

last. I did download the previous claims photos, and it appears that damage from the prior claim makes up a lot of the damage to the home. The PA firm has not separated out the damages between the two claims, and if they do not have a prior iGuide scan, it will be difficult and time consuming to figure out what the damage differences are.

Dkt. # 46-3 at 15.  On April 1, 2024, Windmueller called Washington Restorer, the mitigation company on the First Loss, and learned that the company "did not take a matterport/docusketch or any other type of scan at the time." *Id.* Windmueller noted that he downloaded the documents sent by Washington Restorer in September 2023 "to differentiate between the old and new claims." *Id.*

On April 12, 2024, Windmueller conducted an "Initial Tech [Technical] Review" relating to the Second Loss and sent the review to his manager. Dkt. # 46-4. The Initial Tech Review includes $228,249.38 in "DW Base Covered Damages," and requests $238,249.38 in "Total Dwelling Exposure Authority." *Id.* at 4. Safeco's claim log includes Windmueller's notes from the same day documenting "the repairs on prior claim estimate," which were "[c]onfirmed in bid from Runland Painting and Renovations" (a contractor for with the First Loss).  Dkt. # 34-27 at 11–12.  Finally, also on April 12, 2024, Safeco prepared an estimate for the Second Loss, reflecting replacement cost value (RCV) of $66,791.42 and a net estimate of $64,412.55.  Dkt. # 46-21 at 43.

On April 15, 2024, three days after the Initial Tech Review and initial estimate were completed, Windmueller prepared a revised estimate, with RCV of $68,577.66 and a net estimate of $65,113.53. Dkt. # 46-13 at 42.  Cruz provided this estimate to PPA on April 15, 2024, and issued payment in the amount of $65,113.53.  Dkt. # 46-14.  Safeco's claim log for the second loss includes notes from Windmueller on this date providing, in part: "The Following Partial Denial Applies: Damage and mitigation from the prior claim is not covered under this claim event."  Dkt. # 46-3 at 9.

ORDER – 5

On April 16, 2024, PPA e-mailed Windmueller and other Safeco representatives requesting, in part, "[a]n estimate that includes item descriptions for every line item" and "an itemized reconciliation as to why items on our estimate are not considered." Dkt. # 34-43 at 6–7. In response, Windmueller offered to "discuss the repair estimates for this claim due to the overlap with the previous water claim." *Id.* at 4. On May 13, 2024, PPA followed up with a revised repair estimate, reflecting an updated estimate of structural repairs totaling $454,807.32, inclusive of the $106,442.65 cost of water mitigation. *Id.* at 52–53. PPA and Safeco agreed to convene a virtual meeting to discuss the claim, which went forward as scheduled on May 23, 2024 (the "May 23 Meeting"). Dkt. # 34-44. Windmueller's notes of the May 23 Meeting, as memorialized in the Safeco claim log, indicate that he provided an overview of his analysis of the potential overlap between the claimed damages associated with the First Loss and the Second Loss, as well as other potential errors on PPA's revised estimate, and shared his screen to compare the different iGuide scans for comparative purposes. Dkt. # 34-27 at 3–4. Windmueller's notes conclude:

> [The PPA team] did state that the estimator is not local and wrote the bid remotely and based it on photos and iGuide scans. . . . Overall, the call was very cordial and light. They did apologize for not having the most accurate estimate and stated they would send me photos of the damage to the siding/exterior/osb sheathing in the primary bedroom under the non-arched window. I stated that I would await that documentation. I requested an updated repair bid w/o the prior claim items included and they said they would look into getting that done as they do not write the estimates. I stated that I spent about two weeks on this estimate, and that I know the damages and differences between the claims very well, so if they had questions about my estimate or the repairs in general, they can reach out to me.

*Id.* at 4. Plaintiff's characterization of the May 23 Meeting, however, differs in important respects. Amanda Collins of PPA, who attended the May 23 Meeting on Plaintiff's behalf with a colleague, declares that, during the meeting, PPA "stated that [they] would review any documentation Safeco could provide regarding the First Loss to determine

ORDER – 6

whether any overlap was appropriate." Dkt. # 47 ¶ 23. Collins further states that PPA "never made any 'apologies' for 'inaccuracies' in [their] estimate." *Id.* ¶ 24. Rather, the team "discussed the exterior side and upstairs scope of repairs (both of which were relatively minor items in terms of the overall repair costs), contingent on supporting documentation and further evaluation." *Id.*

Following the May 23 Meeting, Windmueller and PPA had no substantive contact regarding the scope of the disputed claim for several months. In the meantime, Plaintiff filed an Insurance Fair Conduct Act ("IFCA") Notice against Safeco, alleging that it unreasonably failed to cover the Second Loss and timely respond to Plaintiff's requests for information and documents in violation of RCW 48.30.010 and RCW 48.30.015. Dkt. # 46-17. Safeco appears to attribute these developments as resulting from PPA's failure to follow through on their commitment to revise the repair estimate as they had previewed during the May 23 Meeting. *See* Dkt. # 34-46 (July 3, 2024 email from Windmueller to PPA following up on repair estimate); Dkt. # 34-51 (email from Safeco representative to PPA referencing PPA's alleged promise to make "adjustments to the many errors on [their] submitted estimate.") PPA, however, ultimately clarified on September 17, 2024 that it did not view "major revisions" as "necessary to [its] estimate." Dkt. # 34-51 at 3. They further explained: "As we mentioned in [the May 23 Meeting], we did review the estimate in comparison to the previous claim. However, we believe that your estimate significantly underpays and does not fully indemnify our client." *Id.*

Based on the foregoing events, Plaintiff asserts the following causes of action against Safeco: (1) declaratory judgment; (2) breach of insurance contract; (3) breach of the duty of good faith and fair dealing; (4) negligent claims handling; (5) violation of the Consumer Protection Act ("CPA"); (6) injunctive relief; and (7) violation of IFCA. Dkt. # 1-1 at 3–8. Safeco asserts a counterclaim against Plaintiff for breach of the Policy and

ORDER – 7

insurance fraud in violation of Washington common law and RCW 48.01.030, 48.30A.005, and 48.30.230. Dkt. # 9 at 8–10. The Safeco Motion seeks summary judgment, in Defendant's favor, on all of Plaintiff's claims as a matter of law, and requests dismissal of Plaintiff's claims for fees. Dkt. # 33 at 29. The Gonzales Motion seeks summary judgment, in Plaintiff's favor, on the fraud counterclaim and two other "discrete aspects" of the remaining claims (characterized by Plaintiff as "the April 2024 lowballing" issue and "the Overlap Issue"). Dkt. # 35 at 1–2.

### III.    LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In resolving motions for summary judgment, a court does not make credibility determinations or weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court's sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When multiple parties file simultaneous cross-motions for summary judgment on the same claim, the court "must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving

ORDER – 8

party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the movant meets its initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson*, 477 U.S. at 250. A movant's showing of "metaphysical doubt as to the material facts" is insufficient to demonstrate a triable dispute. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Additionally, the court need not "scour the record in search of a genuine issue of triable fact"; rather, the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Kennan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). However, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

### A.    Safeco Motion

#### a.    IFCA Claim

To maintain a claim under IFCA, an insured party must demonstrate that the insurer "unreasonably denied a claim for coverage *or* that the insurer unreasonably denied payment of benefits." *Perez-Crisantos v. State Farm Fire and Casualty Co.*, 187 Wash. 2d 669, 683 (Wash. 2017) (internal citations omitted). Safeco seeks summary judgment of Plaintiff's IFCA claim on the basis that "there was no denial of coverage" for the Second Loss. Dkt. # 33 at 18. However, the fact that Safeco did not deny coverage "does not end the analysis." *Kislenko v. The Standard Fire Ins. Co.*, No. 3:25-CV-05197-DGE, 2026 WL 1162397 (W.D. Wash. Apr. 29, 2026) (citing *Morella v. Safeco Ins. Co. of Illinois*, No. C12-0672RSL, 2013 WL 1562032, at *3 (W.D. Wash. Apr. 12, 2013)). Rather, "the law is clear that 'an unreasonably low offer of payment can constitute an

ORDER – 9

IFCA violation even if the insurer eventually pays.'" *Gaekwar v. Amica Mut. Ins. Co.*, No. 2:22-CV-1551-BJR, 2023 WL 8236983, at *4 (W.D. Wash. Nov. 28, 2023) (citing *Bennett v. Homesite Insurance Company*, 636 F. Supp. 3d 1267, 1274 (W.D. Wash. 2022)).   Specifically, the benefits promised in an insurance policy are "effectively denied" when an insurer:

> [P]ays or offers to pay a paltry amount that is ***not in line with the losses claimed***, is not based on a ***reasoned evaluation of the facts*** (as known or, in some cases, as would have been known had the insurer ***adequately investigated*** the claim), and ***would not compensate the insured for the loss*** at issue[.]

*Morella*, 2013 WL 1562032, at *3 (emphases added).

Safeco acknowledges that insurers can be held liable under IFCA for "constructive denials," but argues that Plaintiff's claim in this case instead reflects a good-faith valuation dispute, which does not amount to a violation under IFCA.  Dkt. # 54 at 6–7 (citing, *inter alia*, *Morella*, 2013 WL 1562032, at *3); Dkt. # 33 at 19 (citing *Young v. Safeco Ins. Co. of Am.*, 2022 U.S. Dist. LEXIS 159142, *22 (W.D. Wash. Sept. 2, 2022)).  Plaintiff, on the other hand, maintains that Safeco's $65,113.53 offer was "unreasonably low" and therefore establishes an IFCA claim.  Dkt. # 45 at 19 (citing *Taladay v. Metro. Grp. Prop. & Cas. Ins. Co.*, 2016 WL 3681469, at *2 (W.D. Wash. July 6, 2016).  Therefore, whether Safeco violated IFCA "is contingent on whether the offer is unreasonably low," *Gaekwar*, 2023 WL 8236983, at *4, or was instead the result of "a reasoned evaluation of the facts," *Morella*, 2013 WL 1562032, at *3.

The record contains "contradictory evidence" with respect to this issue.  *Gaekwar*, 2023 WL 8236983, at *4.  For example, Windmueller's contemporaneous notes of the May 23 Meeting indicate that he spent approximately two weeks preparing the estimate, a timeline which is corroborated by the claim log and the documentation in the record.  Dkt. # 34-27 at 4.  Additionally, the claim log includes notes dated April 12, 2024 (the

ORDER – 10

same date as the Initial Tech Review and initial repair estimate for the Second Loss) attempting to distinguish items from the bid associated with the First Loss. *See* Dkt. # 34-27 at 11–12. These portions of the record demonstrate some degree of reasonable investigative effort by Windmueller to identify the extent of the alleged "overlap" before the two claims prior to making the April 2024 offer, suggesting that Safeco's offer was "based on a reasoned evaluation of the facts." *Morella*, 2013 WL 1562032, at *3.

On the other hand, a declaration from PPA owner Taylor Babb[2] suggests that Windmueller was "obstructive" during the March 7, 2024 inspection and refused to inspect water damage noted by Babb, including potential damage to boxed replacement kitchen cabinets. Dkt. # 49 ¶¶ 5–6; Dkt. # 38 ¶¶ 14–21. During the May 23 Meeting, as justification for denial of Plaintiff's claim for the cabinets, Windmueller claimed that the boxes appeared to be dry in the iGuide scan provided by PPA. Dkt. # 34-27 at 3. Additionally, certain inconsistencies identified by Windmueller as justifications for the "overlap" theory justifying a reduced estimate are contradicted by other Safeco vendors. For example, Windmueller's internal "overlap analysis" notes, documented in the Safeco claim log, provide that the "[t]hree back bedrooms appear to have been remodeled but had no damage from this claim." Dkt. # 34-27 at 12. Windmueller also communicated his understanding that these rooms were undamaged to PPA by email and during the May 23 Meeting. *See* Dkt. # 34-41 (email from Windmueller to PPA attaching repair estimate

---

[2] Safeco characterizes the declarations filed by Plaintiff in support of the Gonzales Motion and in opposition to the Safeco Motion as "belated declarations filed after the close of discovery." Dkt. # 54 at 11. As relevant to Taylor Babb's declarations, Safeco construes Babb's statements about Windmueller's conduct at the March 7, 2024 inspection, and his reporting of that conduct to Amanda Collins, as unsupported by any documentation. *Id.* at 4. The Court acknowledges Safeco's position but finds that the Babb and Collins declarations satisfy the requirements of Federal Rule of Civil Procedure 56(c)(4) and are properly part of the record in this case. Dkt. ## 38–39, 47, 49.

ORDER – 11

and commenting: "[i]t appears that the upstairs was still under some remodeling as baseboards were not attached in the undamaged bedrooms . . ."); Dkt. # 34-27 at 3 (notes from May 23 Meeting providing: "Bedrooms upstairs showed no damage."). However, during a February 16, 2024 inspection, Safeco's external estimating vendor noted that, in at least two of these bedrooms, the mitigation company had removed the baseboards and "marked moisture trapped in wall." Dkt. # 34-27 at 22. Additionally, the record suggests that Windmueller mischaracterized the iGuide scan provided by PPA as a *pre*-mitigation scan throughout the duration of his investigation, despite evidence to the contrary. *See* Dkt. # 34-27 at 15 (Windmueller March 19, 2024 note in Safeco claim log, providing: "I cannot tell if the [February 16, 2024] scan was done prior to the water mitigation for this claim, or was done as mitigation had begun on this claim."); Dkt. 34-36 at 2 (March 19, 2024 email from PPA to Windmueller clarifying that "[m]itigation was underway when [the] scan was done."); Dkt. # 34-27 at 11–12 (Windmueller April 12, 2024 "overlap analysis" notes continuing to reference "pre-mit scan"); Dkt. # 34-27 at 3–4 (Windmueller notes from May 23 Meeting continuing to reference "pre-mit scan"); Dkt. # 47 ¶¶ 5–6 (Collins declaration indicating that Windmueller "seemed to believe" that February 16, 2024 scan was "made before the Second Loss"); Dkt. # 39 ¶ 33 (Collins declaration stating that Windmueller "continued to express confusion regarding the timing of the iGuide and the sequence of the losses" despite clarifications from the PPA team). Finally, Windmueller's post-inspection reserve of $300,000, and his requested dwelling authority total of $238,249.38 as calculated in the Initial Tech Review, far exceed his initial net estimate of $64,412.55, which was prepared on the same day as the Initial Tech Review; nowhere is this discrepancy coherently explained by Safeco. These portions of the record may suggest to a factfinder that the April 2024 offer was not "in line with the losses claimed," was not "based on a reasoned evaluation of the facts," or

ORDER – 12

"would not compensate [Plaintiff] for the loss at issue." *Morella*, 2013 WL 1562032, at *3. Accordingly, the record suggests material factual disputes with respect to the reasonableness of Safeco's investigation of the Second Loss.

In light of the foregoing disputes of material fact, the determination of whether Safeco's offer was unreasonably low or was based on a "a reasoned evaluation of the facts" is a triable question properly left for the jury. *See Gaekwar*, 2023 WL 8236983, at *4; *Morella*, 2013 WL 1562032, at *3. Accordingly, Safeco's request for summary judgment on Plaintiff's IFCA claim is denied. *See Curtis v. State Farm Mutual Automobile Insurance Co.*, 2023 WL 5152560, at *4 (W.D. Wash. August 10, 2023) (denying insurer's motion for summary judgment on IFCA claim because factual disputes existed as to reasonableness of insurer's investigation of claim); *Spicher v. American Family Mutual Insurance Co. S.I.*, 2023 WL 5634210, at *3 (W.D. Wash. August 31, 2023) (denying motion for summary judgment on IFCA claim because "'[r]easonableness' can rarely be resolved at summary judgment, and the record here contains conflicting evidence as to reasonableness").

### b.   Breach of Contract Claim

Under Washington law, "[a] breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *Nw. Indep. Forest. Mfrs. v. Dep't of Labor & Indus.*, 78 Wash.App. 707, 899 P.2d 6, 9 (1995). An insurer breaches its contractual duties under an insurance policy by "failing to complete a reasonable investigation before making a compromise offer, making a compromise offer based on speculation and inaccurate information, and failing to provide a reasonable explanation for its compromise offer." *Sagdai v. Travelers Home & Marine Ins. Co.*, 639 F. Supp. 3d 1091, 1103 (W.D. Wash. 2022).

ORDER – 13

Safeco contends that summary judgment should be granted on Plaintiff's contractual claims because coverage was provided for the Second Loss, Safeco "paid for repairs supported by documented evidence," and Plaintiff's other claimed damages are "unsupported in the record." Dkt. # 33 at 22–23. For the reasons described with respect to Plaintiff's IFCA claim, genuine disputes of material fact exist as to whether Safeco completed a "reasonable investigation" before making its April 2024 compromise offer to Plaintiff. *Sagdai*, 639 F. Supp. 3d at 1103. The parties also plainly dispute whether the offer was based on "speculation" or "inaccurate information" with respect to the potential overlap. *Id.* Finally, there is a genuine dispute as to whether Safeco provided a "reasonable explanation" for offer, given what Plaintiff describes as a lack of itemization or other explanation regarding how Safeco derived its overlap offset calculation. *Id.* Accordingly, Safeco's request for summary judgment on Plaintiff's breach of contract claim is denied.

### c.  Bad Faith Claim

To prove bad faith, an insured must show the insurer's breach of the insurance contract was unreasonable, frivolous, or unfounded. *American States Ins. Co. v. Symes of Silverdale, Inc.*, 150 Wn.2d 462, 469-70, 78 P.3d 1266 (2003) (citing *Overton v. Consol Ins. Co.*, 145 Wn.2d 417, 433, 38 P.3d 322 (2002)).

Here, genuine disputes of material facts exist as to whether Safeco's alleged breach of the Policy overemphasized its own interests in making Plaintiff an unreasonably low offer, or whether Safeco's investigation was otherwise unreasonable or unfounded based on the facts and circumstances existing at the time it made the decision in question. *Keller v. Allstate Ins. Co.*, 81 Wn. App. 624, 633, 915 P.2d 1140 (1996). While Safeco argues that PPA "did not cooperatively discuss further updates on repair estimates after May 2024" in support of its position that the bad faith claim should

ORDER – 14

be dismissed, Dkt. # 33 at 25, the Court notes that PPA's refusal to submit a revised estimate occurred *after* what Plaintiff views as the operative unreasonable "denial" of her claim.  By contrast, Windmueller has not characterized PPA's conduct *prior* to the April 2024 offer as uncooperative; on the contrary, he acknowledged in his deposition that PPA did not impede his investigation and provided any available requested documents and scans.  Dkt. # 46-2 at 22.  *See Wilson v. Geico Indem. Co.*, No. C18-226 RAJ, 2018 WL 3869436, at *4 (W.D. Wash. Aug. 15, 2018) (rejecting insurer's affirmative defense of non-cooperation where record indicated that "Plaintiff cooperated and provided requested information up to the point of [insurer's] apparent denial of coverage" and insurer only identified non-cooperation "*after* the denial of coverage").

Accordingly, Safeco's request for summary judgment on Plaintiff's bad faith claim is denied.

### d.  Negligent Claims Handling Claim

Safeco seeks summary judgment of Plaintiff's negligent claims handling claim, arguing that that "[a]ny allegations that Safeco failed to 'use ordinary care' are subject to dismissal as a matter of law for the same reasons referenced above as grounds for dismissal of the bad faith action."  Dkt. # 33 at 26 (citing *State Ins. Co. v. Kemper Nat. Ins. Co.*, 94 Wn.App. 602, 612-13, 971 P.2d 953 (1999)).  Safeco does not reassert this argument on Reply.  However, for the reasons previously discussed, the Court concludes that the current record demonstrates a genuine dispute as to whether Safeco used ordinary care in calculating the alleged "overlap" between the First Loss and the Second Loss before making its April 2024 offer to Plaintiff.  Accordingly, Safeco's request for summary judgment on Plaintiff's negligent claims handling claim is denied.

ORDER – 15

e.   Consumer Protection Act Claim

To prevail on a CPA claim, a plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation. *Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 784 (1986).  An insurer's breach of its duty of good faith constitutes a *per se* violation of the CPA.  *See Gingrich v. Unigard Sec. Ins. Co.*, 57 Wash. App. 424, 433, 788 P.2d 1096, 1101 (1990) (citing RCW 48.01.030).  For the reasons already discussed in this Order, the record identifies genuine disputes as to whether Safeco acted in good faith in its handling of the Second Loss; this alone precludes summary judgment on the CPA claim.  Accordingly, Safeco's request for summary judgment on Plaintiff's CPA claim is denied.

**B.     Gonzales Motion**

a.   Fraud Counterclaim

Plaintiff seeks summary judgment on Safeco's fraud counterclaim, on the bases that Safeco's counterclaim arises solely out of alleged conduct by PPA, not Plaintiff, and that there is no evidence to support a finding of "intentional" fraud or concealment as required by the applicable provision in the Policy. Dkt. # 35 at 2–3.  As to the first point, the Court notes that at least one court in this District has imputed the representations of an insured's public adjuster to the insured.  *See Reverse Now VII, LLC v. Or. Mut. Ins. Co.*, 341 F. Supp. 3d 1233, 1238 (W.D. Wash. 2018).  While the facts of that case may be distinguishable from the instant case, the Court will presume in resolving the Gonzales Motion that PPA's conduct may be imputed to Plaintiff.  As to the second point, Safeco notes that its counterclaim is premised not just on the terms of the Policy, but also on allegations of insurance fraud in violation of Washington common law and various

ORDER – 16

statutes. Dkt. # 42 at 19–20. The Court therefore turns to whether there are any substantive disputes precluding summary judgment on Safeco's fraud counterclaim.

For reasons similar to those articulated in the portion of this Order addressing Plaintiff's IFCA claims, the Court concludes that the issue of whether PPA is liable on Safeco's fraud counterclaim presents genuine disputes of material fact. On the one hand, like Safeco, PPA was entitled to dispute Safeco's repair estimates in good faith, and there is certainly evidence in the record reflecting that their correspondence during the claims process (including their initial estimates and refusal to withdraw or revise their second estimate after the May 23 Meeting) reflected that disagreement. *See, e.g.*, Dkt. # 55 at 29, 57. On the other hand, there is also some contemporaneous evidence, presented by Safeco, that PPA acknowledged at least a few discrepancies during the May 23 Meeting, and did not make any efforts to make revisions—major or minor—to their estimate until confronted by Safeco regarding the expiration of Plaintiff's ALE benefits months later. *See, e.g.*, Dkt. # 34-27 at 3–4; Dkt. # 55 at 65; Dkt. # 46-18. Ultimately, construing the record in favor of Safeco, the non-movant, the Court concludes that "whether these disputed factual issues rise to the level of fraud or misrepresentation" is a triable question for a jury. *Bronsink v. Allied Prop. & Cas. Ins. Co.*, No. C09-751MJP, 2010 WL 2342538, at *10 (W.D. Wash. June 8, 2010). Accordingly, Plaintiff's request for summary judgment on Safeco's fraud counterclaim is denied.

b. Discrete Findings

Plaintiff also requests summary judgment on two other "discrete aspects" of the claims in this case, described respectively as the "April 2024 Lowballing" and (2) the "Overlap Issue." Dkt. # 35 at 1–2. As to the April 2024 Lowballing issue, Plaintiff requests that this Court hold that Safeco "breached its contractual and statutory duties by issuing an unreasonably low payment in April 2024." *Id.* at 24. For the reasons identified

ORDER – 17

in the discussion of Plaintiff's IFCA claims, genuine disputes of material fact exist precluding summary judgment—in favor of either party—as to whether Safeco's April 2024 offer was "unreasonably low."

As to the Overlap Issue, Plaintiff requests entry of an order holding that: (1) Safeco violated Washington law by failing to provide notice and a reasonable explanation for its partial denial of coverage based on the alleged "overlap"; (2) the Policy does not permit an "overlap" deduction between two separate and distinct loss events; and (3) Safeco is precluded from asserting an "overlap" reduction to limit coverage for the Second Loss. *Id.* These requests are similarly inappropriate for resolution at the summary judgment stage based on the record in this case. While, as Plaintiff notes, there is some evidence that Safeco internally classified its April 2024 coverage decision on the Second Loss as a "partial denial" on the basis of the potential for overlap with the First Loss, Dkt. # 46-3 at 9, Safeco continues to dispute that there was any coverage denial and argues that the April 2024 offer instead reflects a mere scoping dispute. The Court's entry of the relief requested by Plaintiff would risk pre-deciding the disputed issue of whether Safeco's April 2024 offer reflected an "unreasonable denial" under IFCA or a good-faith valuation dispute. And while Plaintiff argues that the "the Policy is silent on a purported limitation" and "Washington law requires that such silence be construed in favor of coverage," Dkt. # 35 at 19, Plaintiff elsewhere acknowledges Washington case law recognizing the general rule against double recovery. Dkt. # 45 at 1 (citing *Weyerhaeuser Co. v. Com. Union Ins. Co.*, 142 Wash.2d 654, 674–75 (2000)).

For these reasons, Plaintiff's requests for summary judgment on the April 2024 Lowballing issue and the Overlap Issue are denied.

ORDER – 18

**C.      Attorneys' Fees**

Because the Court denies both Motions, the Court declines to consider at this time the arguments raised in the Safeco Motion regarding Plaintiff's entitlement to attorneys' fees under IFCA and the CPA.  *See* Dkt. # 33 at 28.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** the Safeco Motion and the Gonzales Motion.

Dated this 22nd day of May, 2026.

*Richard A. Jones*
_____

The Honorable Richard A. Jones
United States District Judge

ORDER – 19